IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| CYNTHIA D. WOODMANCY, | ) | 8:12CV90 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MEMORANDUM AND ORDER ON |
| v. | ) | REVIEW OF THE FINAL DECISION |
| | ) | OF THE COMMISSIONER OF THE |
| CAROLYN W. COLVIN, Acting | ) | SOCIAL SECURITY |
| Commissioner of the Social Security | ) | ADMINISTRATION |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

On March 6, 2012 , the plaintiff, Cynthia D. Woodmancy, filed a complaint against the defendant, Michael J. Astrue, Commissioner of the Social Security Administration. (ECF No. 1.)[1] Woodmancy seeks a review of the Commissioner's decision to deny her applications for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401 et seq., and for Supplemental Security Income (SSI) benefits under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq. See 42 U.S.C. §§ 405(g) and 1383(c)(3) (providing for judicial review of the Commissioner's final decisions under Titles II and XVI). The Commissioner has filed an answer to the complaint and a transcript of the administrative record. (See ECF Nos. 5-8.) In addition, the parties have filed briefs in support of their respective

---

[1] Carolyn W. Colvin has since been appointed to serve as Acting Commissioner of the Social Security Administration, (see Notice of Substitution, ECF No. 22), and as Astrue's successor, Colvin is "automatically substituted as a party," Fed. R. Civ. P. 25(d).

1

positions.  (See Pl.'s Br., ECF No. 14; Def.'s Br., ECF No. 20.)  I have carefully reviewed these materials, and I find that the case must be remanded for further proceedings.

## I.  BACKGROUND

On or about December 16, 2009, Woodmancy filed applications for disability insurance benefits and SSI benefits.  (Transcript of Social Security Proceedings (hereinafter "Tr.") at 137-150.  See also id. at 64-65 (indicating that the applications were filed on December 4, 2009).)  The applications were denied on initial review, (id. at 64-65, 72-80), and on reconsideration, (id. at 67-68, 83-92).  Woodmancy then requested a hearing before an ALJ.  (Id. at 96-98.)  The hearing was held on September 19, 2011, (e.g., id. at 32), and, in a decision dated October 20, 2011, the ALJ concluded that Woodmancy "has not been under a disability, as defined in the Social Security Act, from October 31, 2009, through the date of this decision," (id. at 25 (citations omitted); see also id. at 13-26).  Woodmancy requested that the Appeals Council of the Social Security Administration review the ALJ's decision. (See id. at 8-9.)  This request was denied, (see id. at 1-3), and therefore the ALJ's decision stands as the final decision of the Commissioner.

## II.  SUMMARY OF THE RECORD

On a Disability Report form, Woodmancy claimed that she became disabled on October 31, 2009, due to a heart attack.  (Tr. at 178.)  She claimed later that she was also experiencing "intestinal incontinance [sic] on occasions," weakness, "mental confusion," "continuing headaches increasing in intensity," "continued bruises on left cheek area," panic attacks, and depression.  (Id. at 223, 269.  See also id. at 38-39.)

2

She was born in October 1952, and she completed the twelfth grade. (Id. at 173, 179.) She has past work experience as a dispatcher, telephone solicitor, information clerk, and collection clerk. (Id. at 282.)

### A.  Medical Evidence[2]

Woodmancy suffered a heart attack on October 31, 2009. (Tr. at 411-412.) She was transported to Bergan Mercy Medical Center in Omaha, Nebraska, where an "EKG revealed [the] presence of extensive anterolateral acute myocardial infarction with hyperacute changes." (Id. at 377.) Himanshu Agarwal, M.D., performed a left heart catheterization, a coronary angiography, a left ventriculography, and an emergency angioplasty, and he placed a stent in the left anterior descending artery. (Id. at 375.) Shortly thereafter, Charles Huh, M.D., diagnosed an upper gastrointestinal bleed and ordered an emergency upper endoscopy. (Id. at 380.) The endoscopy revealed a 1 centimeter ulcer "with a probable visible vessel" in "the proximal stomach just below the GE junction" and a "probable Mallory Weiss tear at the GE junction." (Id. at 429.) The ulcer and tear were treated with injections of epinephrine, and two clips were placed on the vessel. (Id.) Woodmancy "tolerated the procedure well" and "was monitored in the intensive care unit in stable condition without any immediate complications." (Id.) Joseph Bast, M.D., then diagnosed a nonoliguric acute kidney injury, (id. at 390), and on November 3, 2009, Woodmancy underwent surgery for renal insufficiency, (id. at 427).

Woodmancy's hospitalization continued throughout November and into

---

[2]  My review of the medical evidence emphasizes the records cited by the parties in their briefs. (See Pl.'s Br. at 3-9, ECF No. 14; Def.'s Br. at 3-10, ECF No. 20.) I note in passing that several of the records' page numbers are not legible.

3

December 2009.  On November 6, 2009, a CT scan of the abdomen and pelvis revealed a "Small bowel ileus," "Thickening of the wall of the cecum," "Retroperitoneal hemotoma inferior to the right kidney, measuring at least 10 cm in size," "Left inguinal hematoma," "Left lower lobe collapse," and "Dilation of the small bowel compatible with ileus."  (Id. at 311.)  Woodmancy was diagnosed with acute renal failure and underwent hemodialysis.  (E.g., id. at 382.)  On November 8, 2009, Thomas Connolly, M.D., diagnosed "pneumonia secondary to an extremely resistant Acinetobacter baumannii," which was treated with various medications.  (Id. at 382, 384.)  Woodmancy also suffered respiratory failure, and a tracheostomy was performed on November 19, 2009.  (Id. at 423.)

Andrew Lee, M.D., met with Woodmancy on November 30, 2009, for a rehabilitation consultation.  (Id. at 386.)  Dr. Lee noted that Woodmancy was debilitated and was experiencing dysphagia, nausea, diarrhea, and "some vertigo that will last for a couple of seconds when she initially sits up."  (Id. at 387.)  He ordered Woodmancy to "[c]ontinue with strengthening" and other therapies "as tolerated," and he ordered "speech therapy to do a cognitive evaluation given her probable anoxic encephalopathy."  (Id. at 388.)

On December 2, 2009, studies of Woodmancy's legs revealed acute deep vein thrombosis of the right posterior tibial vein and soleal vein, acute deep vein thrombosis of the left femoral vein, and acute thrombus in the left lesser saphenous vein.  (Id. at 418.)  On December 16, 2009, examination of Woodmancy's right leg revealed a "[b]enign osteochondroma" of the right tibia, but T. Kevin O'Malley, M.D., determined that  it did not warrant surgical intervention.  (Id. at 398-399.)

Woodmancy was discharged from the Bergan Mercy Medical Center on December 21, 2009, with the following diagnoses: "ST elevation myocardial

4

infarction," "Debility," "Malnutrition," "Anemia," "Retroperitoneal hematoma," "Status post inferior vena caval (IVC) filter placement," "Pulmonary embolism," "Right leg deep venous thrombosis," and "Osteochondroma of the right lower extremity." (Id. at 402.) Maxwell Larweh, M.D., noted,

> This 57-year-old woman was initially admitted by the cardiology service with the above diagnosis. Her hospital course was complicated by respiratory failure, retroperitoneal hematoma and persistent anemia. She underwent multiple procedures including tracheostomy and IVC filter placement. . . . She clinically improved with supportive care. . . . She is being discharged to Nebraska Skilled Nursing Facility to continue her rehabilitation.

(Id.)

Woodmancy began inpatient physical and occupational therapy at Nebraska Skilled Nursing (NSN) on December 21, 2009. (E.g., id. at 491.) Records dated shortly after Woodmancy's admission to NSN indicate that she was suffering from urinary incontinence, bowel incontinence, and loose stools, and she had difficulty swallowing. (Id. at 708.) They also indicate that she was at high risk for falling, and she began a program of physical therapy. (Id. at 538-539, 541-547.) A residency assessment protocol summary bearing various dates between December 27, 2009, and January 2, 2010, states that Woodmancy's health issues caused her mood to deteriorate; that her vision was impaired; that she had "generalized weakness" and needed "limited assistance with most of her ADLs"; that she was "occasionally incontinent of urine" and wore "a brief when out of bed"; and that she was receiving treatment for depression. (Id. at 570-573, 878-881. See also id. at 565 (indicating that on January 2, 2010, Woodmancy experienced bowel incontinence 2-3 times per week and bladder incontinence 2 or more times per week).) A physical therapy progress report dated January 14, 2010, states that Woodmancy continued to require

5

therapeutic exercise, neuromuscular reeducation, gait training, therapeutic activities, and electrical stimulation.  (Id. at 539.)  The report also stated that Woodmancy "gets severe coughing spells from activity," "frequently reports nausea," and "[h]as continued deficits in strength."  (Id.)  A treatment plan  bearing certification dates "from 12/22/2009 through 01/20/2010" states that precautions needed to be taken for Woodmancy's bowel incontinence, loose stools, and "fall risk."  (Id. at 800.)  By February 11, 2010, it appears that Woodmancy was able to ambulate with a steady gait and care for herself independently.  (Id. at 525.)  She was discharged home on February 12, 2010.  (Id. at 667.)

On March 23, 2010, Samuel Moessner, M.D., examined Woodmancy to determine her eligibility for disability benefits.  (Id. at 574-589.)  He noted that Woodmancy was discharged from the skilled nursing unit in February 2010 "on Plavix" and "hypertensive medication," but she had "discontinued Plavix two or three days ago due to the cost of medication."  (Id. at 577.  See also id. at 589.)  She was also taking an antidepressant, though she was not seeing a counselor or psychiatrist.  (Id. at 578, 583.)  Woodmancy reported that instability in her left leg had been improving, but she was still using a cane due to "balance problems."  (Id. at 577, 579.  See also id. at 583.)  She also reported that she felt weakness, fatigue, and exhaustion "after about 15 minutes of activity such as making her bed or washing her dishes."  (Id. at 578.)  Woodmancy was able to bathe, feed, and dress herself independently, however.  (Id. at 578.  See also id. at 579 ("She does do some light housework including microwave cooking, does a little laundry, which is provided in the building. She does make her bed and wash her dishes, but allows her daughter to come over for major cleaning and to take her shopping.").)  She said that she could lift a maximum of about ten pounds, and she could sit for one hour, stand for 15 minutes, and

"perhaps walk several blocks." (Id. at 578.)  She could use her hands "fairly well," but she "had some tremulousness in her hands." (Id. at 578, 583.)  She also had "some degree of problems with stooping, climbing stairs, kneeling, crawling, squatting, bending, twisting, and reaching." (Id. at 578.)  Woodmancy explained that she could "do a lot of things, but they take a long time, [and she] has to sit down and rest after unloading the dishwasher or making her bed." (Id. at 579.)  She also said that she "has daily headaches on the left side of her head," (id. at 581), and "some urgency of diarrhea sometimes," (id. at 582).

Woodmancy stated that she "is hoping to be able to get Disability, so she would qualify for housing subsidy, food stamps, Medicare and other benefits." (Id. at 580.)  She added that she did not think she could go back to work for her previous employer, "although she can still use computers at home daily for a while." (Id.)

Dr. Moessner noted that Woodmancy was "well-developed, well-nourished, alert, pleasant, . . . in no acute distress, polite and friendly, but tearful at times." (Id. at 584.)  He also noted that she moved about "fairly easily" and "could possibly get along without the cane, but [she] uses it for balance support." (Id. But see id. at 588 (indicating that testing revealed balance difficulties).)  Woodmancy had "one 1+ edema around the feet and ankles and extending somewhat up into the calf regions." (Id. at 587.)  There was "some soft tissue swelling around the knee suggesting effusions," and "generally the lower extremities from the pelvis downward show[ed] some irregular soft tissue swelling suggesting venous insufficiency." (Id.)  Also, there was "indurated lumpy swelling in the calf regions consistent with deep venous thrombosis." (Id.)

On March 31, 2010, Glen Knosp, M.D., reviewed the records and completed a Physical Residual Functional Capacity Assessment. (Id. at 595-603.)  Dr. Knosp

concluded on October 31, 2010, Woodmancy would be able to occasionally lift 10 pounds, frequently lift less than 10 pounds, stand or walk at least 2 hours in an 8-hour workday, sit for about 6 hours in an 8-hour workday, and occasionally climb, balance, stoop, kneel, crouch, and crawl. (Id. at 595, 596-597.) He wrote,

> The clmt is alleging limitations from a recent heart attack. The evidence in file does corroborate her allegations, but does not M/E a listing. The evidence also shows she is unable to stand for long periods of time, and her current use of a cane limits the amount of weight she can carry. Her limitations are reasonable given the history, but they fail to result in persistent or sustainable functional limitations. Prior to 10/31/09, evidence shows she was capable of at least sedentary work. Recent evidence shows improvement, and it is expected that she will continue to improve by 10/31/10. At that time, she can reasonably be expected to perform sedentary work as outlined. Considering the overall evidence, she should avoid strenuous activities and prolonged ambulation, and her allegations appear to be credible.

(Id. at 602.)

On May 10, 2010, Woodmancy visited the Douglas County Department of General Assistance Primary Health Care Network Clinic and received prescriptions for metoprolol, Zocor, and Plavix. (Id. at 624.) She returned on May 20, 2010, with complaints of ear ache, headaches, nocturia, and "occasional bowel incontinence." (Id. at 628.) She also mentioned that she was tired and experiencing "some emotional disturbance." (Id.) She returned again on June 7, 2010, and obtained refills of her prescriptions. (Id. at 624.)

Bridget Larson, Ph.D., examined Woodmancy on July 14, 2010, and prepared a psychological report. (Id. at 630-634.) Woodmancy told Dr. Larson that "she is no longer the same person" since her October 2009 heart attack. (Id. at 631.) More specifically, Woodmancy said that "she is easily frustrated, has problems with her memory, and is extremely emotional." (Id.) She added that she sometimes "fears if

she closes her eyes she will die again," and "she typically experiences a panic attack every evening when she is alone in her apartment and begins thinking of all she went through." (Id.)  In addition, she said that she "dreads going out in public," mainly "because she has to wear adult diapers due to having had several accidents in public." (Id.)  Woodmancy reported that she was taking Lexapro for anxiety, but she has never been hospitalized for mental health treatment, nor has she ever been involved in therapy.  (Id. at 632.)

Woodmancy said that "she is able to complete all of her activities of daily living, walks her dog at least three or four times a day around her apartment complex, socializes daily with several neighbors in their apartments, and completes at least one chore per day." (Id.  See also id. at 632-633.)  She also said, however, that she needed to use a cane to assist her in walking long distances, and "extensive motor activity" caused her to experience "throbbing pain in her knees." (Id. at 632.)  In addition, Woodmancy reported that her long term memory, short term memory, and concentration were poor.  (Id.)

Dr. Larson concluded that Woodmancy "does not appear to have any restriction of daily activities nor does she have any difficulty maintaining social functioning." (Id. at 633.)  She added, "[Woodmancy] appears to be able to remember simple and complex instructions, and she can complete tasks under ordinary supervision.  She does not appear to have any difficulty relating appropriately to others.  Cynthia's concentration and attention appears [sic] to be adequate, although she reported difficulty in this area.  Cynthia indicated that her symptoms exacerbate in the evenings when she is at home alone and begins thinking of the trauma she experienced following her heart attack.  Cynthia would have no difficulty adapting to changes in life or structure." (Id.  See also id. at 634.)  Dr. Larson diagnosed

9

"Posttraumatic Stress Disorder, Chronic," "Problems with lower back pain (By Report)," and "Occupational problems," and she determined that Woodmancy's current GAF score was 61.  (Id.)[3]  Dr. Larson's report concludes,

> Prognosis is hopeful for Cynthia from a mental health standpoint. She appears to have a history of experiencing severe anxiety associated with her October 2009 heart attack.  She indicated experiencing recurrent and intrusive thoughts about the day of her heart attack and subsequent recovery, has a sense of a possible foreshortened future, has difficulty concentrating, experiences panic attacks and is irritable and sad.  She also avoids leaving her apartment complex due to her anxiety and medical concerns.  However, she does have several friends within her apartment complex that she visits on a daily basis, and will run errands if her daughter accompanies her.  Cynthia is taking psychotropic medication to assist in managing her symptoms.  However, she is not receiving any mental health therapy currently.  If she were to receive consistent mental health therapy in addition to her medication management, her symptoms should improve significantly.

(Id.)

On November 30, 2010, Woodmancy visited Joseph B. Thibodeau, M.D., at the Alegent Health Clinic in Omaha, Nebraska, with complaints of chest pain, chest

---

[3] "The GAF is a numeric scale ranging from zero to one hundred used to rate social, occupational and psychological functioning 'on a hypothetical continuum of mental health-illness.'"  Pate-Fires v. Astrue, 564 F.3d 935, 937 n.1 (8th Cir. 2009) (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994) (hereinafter DSM-IV)).  "A GAF of 41 to 50 indicates the individual has '[s]erious symptoms . . . or any serious impairment in social, occupational, or school functioning . . . .'"  Id. at 938 n.2 (quoting DSM-IV at 32).  "A GAF of 51 to 60 indicates the individual has '[m]oderate symptoms . . . or moderate difficulty in social, occupational, or school functioning . . . .'"  Id. at 938 n.3 (quoting DSM-IV at 32).  A GAF of 61 to 70 indicates that the individual has "[s]ome mild symptoms . . . or some difficulty in social, occupational, or school functioning . . . , but [is] generally functioning pretty well . . . ."  DSM-IV at 32.

tightness, lightheadedness, and weakness in her legs.  (Id. at 887.)  She reported that she was smoking five or six cigarettes per day, but it appears that she was taking her medications as directed.  (Id.)  After examining Woodmancy, Dr. Thibodeau diagnosed "Typical angina," "Coronary artery disease, history of acute MI and PCI," "Dyslipidemia," "Previous history of out of hospital cardiac arrest," and "Type 2 diabetes mellitus," and he arranged for her to undergo a diagnostic cardiac catheterization.  (Id. at 887-888.)

Ann Narmi, M.D., performed a coronary angiography on December 3, 2010.  (Id. at 885-886.)  The procedure "revealed mild irregularities to the proximal circumflex artery but otherwise normal circumflex system," "proximal LAD of 20-30% stenosis," "approximately 40% in-stent restenosis noted throughout the length of the stents" already in place, "a 80-90% blockage of a very small diagonal artery which was largely unchanged from a previous cardiac catheterization," and a normal right coronary artery.  (Id. at 885.)  Dr. Narmi also performed an echocardiogram on January 3, 2011, which revealed a "[v]isually estimated left ventricular ejection fraction [of] 60-65%"; "[i]mpaired relaxation pattern of LV diastolic filling"; and normal left ventricular size, thickness, and function.  (Id. at 883.)

Woodmancy's physician referred her for psychotherapy, and on February 28, 2011, Shari Conner, Ph.D., of Catholic Charities conducted an initial diagnostic interview.  (Id. at 657-665.)  Woodmancy indicated that she was seeking therapy to decrease her crying spells, improve her self-concept and self-worth, improve her social support, and decrease her anxiety symptoms.  (Id. at 657.)  She said that she "had significant anxiety symptoms prior to her heart attack, including panic attacks," but these have "dramatically intensified due to her financial strain and many physical changes (e.g., she is now incontinent, has trouble walking, and has more general

11

malaise).”  (Id.)  She also said that she was feeling depressed and hopeless, and that her mother died two days before the interview.  (Id.)  Woodmancy reported suffering from frequent headaches, dizziness, restless leg syndrome, a change in vision, a change in her sense of smell, dental problems, COPD, abdominal pain, incontinence, arthritis, left leg weakness, high blood pressure, coronary artery disease, and chest pain.  (Id. at 660.)  Dr. Conner also noted that Woodmancy was suffering from obsessions or intrusive thoughts; worrying; engaging in some compulsive behavior (such as handwashing and binge eating); experiencing some irritability and restlessness; and suffering from delusions, anxiousness, dissociation, paranoia, and short-term memory problems.  (Id. at 662.) Dr. Conner diagnosed “Major Depressive Disorder, Recurrent, Severe,” “Anxiety Disorder NOS, with features of PTSD and Panic Disorder,” “S/P myocardial infarction,” “COPD,” “Incontinence/nerve damage,” “migraines,” and “disruptions in primary support relationships; insufficient social support; financial stressors; chronic health issues; housing and occupational concerns.”  (Id. at 664.)  She assigned Woodmancy a GAF score of 48, and she recommended that Woodmancy begin weekly outpatient psychotherapy.  (Id.)

Woodmancy attended her initial “mental health session” at Catholic Charities on March 10, 2011.  (Id. at 905.)  Therapist Sheryl Scott noted that Woodmancy was “tearful throughout the session” and “reported feeling frustrated with ‘the system’ as she is having difficulty getting approval for disability.”  (Id.)  Woodmancy also “reported having anxiety, racing thoughts and feeling depressed.”  (Id.)  Scott determined that Woodmancy was “so fragile at this point that goals could not be established during initial session,” but she agreed on a plan for the next session.  (Id.)

Woodmancy attended another session with Scott and “community support worker” Carole Schneider on March 23, 2011.  (Id. at 904.)  Scott wrote,

12

[Woodmancy] had difficulty making consistent eye contact. She talked about the recent funeral of her mother and how she has been having a "sad week." Cynthia rated her depression an 8 on a scale of 1 to 10 and identified that having money, resources and services would greatly decrease her depression. She is focused on getting approved for disability and Medicaid and has difficulty focusing on what she can do today. Cynthia [is] going back to the past and talking about how everything was taken from her and "they" have no right to tell her how to feel about moving to a GA apartment or Section 8 Housing. Carole Schneider joined the session and offered and explained ideas to Cynthia; however, Cynthia [is] not receptive to GA or changing doctors or applying for housing voucher.

(Id. See also id. ("'If you think I am going to give up my apartment, I'm not. I've worked my whole life just to be slapped in the face. I just want to go back to when I was healthy and working.' Cynthia is unable to focus on managing her depression as she is very fixated on disability and services.").)

Woodmancy attended another session with Scott on April 6, 2011, and "brought a painting with her that she [had] worked on for the past two weeks." (Id. at 903.) She said that this was the first time she had painted since her heart attack, and painting made her feel "relaxed and happy." (Id.) Woodmancy "was encouraged to do some art therapy, work on affirmations and continue reframing negative thoughts into positive." (Id.)

On April 20, 2011, Woodmancy told Scott that her doctor had changed her medication from Celexa to Prozac, and she was "feeling more tearful and sad and having difficulty not crying every day." (Id. at 902.) Woodmancy also reported that she had not been motivated to do artwork, she was having "racing thoughts and 'creepy' dreams," she felt like a burden to her daughter, and she felt "angry about not receiving disability." (Id.)

Woodmancy told Scott on May 16, 2011, that "she was having a good day."

(Id. at 901.)  Nevertheless, Scott noted that Woodmancy was tearful "and ha[d] difficulty letting go of intrusive thoughts related to her cardiac arrest. (Id.) Scott also noted that Woodmancy suffered incontinence on her bus ride to the session, but "she was able to work through this." (Id.)  She was tearful when discussing her reliance upon her daughter for monetary support, and she noted that she was anxious in the evening and suffering from insomnia.  (Id.)

On June 2, 2011, Woodmancy told Scott that she felt depressed and lonely and was missing her mother. (Id. at 900.)  She attempted to paint but "was not feeling creative."  (Id.)  On June 16, Woodmancy reported that she was "feeling more depressed and her physical condition appears to be worsening." (Id. at 899.)  She talked about her incontinence, her difficulty walking, and her ability to do household tasks "for only a short time before she is exhausted." (Id.)  "She realte[d] that she is unable to find any meaning in her life and feels that God is punishing her for her past and that is why she was revived during her heart attack." (Id.)  On June 23, Woodmancy reported that she was "feeling very depressed," as the second anniversary of her sister's death was approaching. (Id. at 898.) She also "related that she is still being victimized by the disability board and doesn't want to accept her situation because that would mean dealing with who she is 'now.'" (Id.)  In addition, she reported that she could not "get up the energy" to paint or sketch, and she did not feel that obtaining a part time job would be "realistic." (Id.)

Scott's clinical note dated July 28, 2011, states that Woodmancy was "extremely depressed and tearful today." (Id. at 897.)  She was incontinent on the way to her session, and she needed assistance and dry clothing. (Id.)  She reported "feeling mortified and humiliated," and she was "angry that she cannot get any assistance from SSI." (Id.)  She also reported that she could not work "due to her

physical condition and she is afraid to work because she is incontinent, walks with a cane, and cannot focus." (Id.) She repeated that she believed God wanted to punish her, and she felt "victimized, out of control and miserable." (Id.) A note dated August 11, 2011, indicates that Woodmancy continued to be tearful and anxious about her physical problems, incontinence, low energy, and inability to focus. (Id. at 896.) Scott noted that Woodmancy seemed "unwilling at this time to pursue any leisure activities or techniques," and "[s]he continues to focus on the negative and states that she cannot see the good in her life at this time." (Id.)

On August 25, 2011, Woodmancy told Scott that she felt better emotionally, but was continuing to suffer incontinence and weakness in her upper body and legs. (Id. at 895.) She was also experiencing headaches, and she reported that her blood pressure was found to be "very high." (Id.) She added that she had grown closer to her sister, and "their relationship is important to her." (Id.)

In a letter dated September 19, 2011, James Ortman, M.D., wrote "to confirm that . . . Woodmancy does have problems with intermittent bowel and bladder incontinence" that was "probably secondary to nerve injury at the time of a retroperitoneal hematoma during a severe illness in 2009." (Id. at 907.)

## B.   Woodmancy's Hearing Testimony

During the hearing before the ALJ on September 19, 2011, Woodmancy testified that after she completed her inpatient rehabilitation, she still had "considerable nerve damage" that affects her ability to walk and causes her to experience bowel and bladder incontinence. (Tr. at 49-50. See also id. at 59 (indicating that Woodmancy was directed to use a cane "as needed" by Nebraska Skilled Nursing).) She said that she has talked to Dr. Ortman about her incontinence problems, (id. at 52), but it does not appear that Woodmancy was asked any questions

about whether she has sought or received any type of treatment for incontinence, apart from wearing "protection," (id. at 50). Woodmancy indicated that her heart was now "good," but she was disabled due to incontinence and her "exhaustion level." (Id. at 52-53.) She said that she "would like to find a little part-time job that would fit into [her] physical capabilities right now," perhaps working "three days a week for a four hour shift each day," but so far she had been unable to find such a position. (Id. at 53-54.) She also testified that she only leaves her home approximately twice per week because she is "too tired," and she naps every day for 1-3 hours. (Id. at 57-58.)

Woodmancy testified that she had been taking Lexapro for anxiety or depression during her hospitalization, but she has since switched to Buspar and Prozac. (Id. at 55-56.) She said that she has anxiety attacks "on almost a daily basis" that last from twenty minutes to several hours. (Id. at 57.) She also said that she suffers migraine headaches. (Id. at 58.)

### C.   Vocational Expert's Testimony

During the hearing, the ALJ asked a Vocational Expert (VE) to consider an individual "who is 57 at the onset date" and "has a high school education" "who needs sedentary work, and by that I mean, work that does not involve being on one's feet or standing or walking more than two hours in an eight hour day but could sit for at least, if not more, than six hours a day; could occasionally do all postural activities: Climb, balance, stoop, kneel, crouch, crawl; could occasionally do postural activities: Climb, balance, and stoop; and from an environmental standpoint avoid concentrated exposure to cold, heat, fumes, and hazards." (Tr. at 60-61.) She then asked, "So with that functional capacity, could such an individual return to any or all of the past work?" (Id. at 61.) The VE responded, "All for past work, your honor." (Id.)

16

Woodmancy's counsel asked the VE, "based on the claimant's testimony, would she be able to return to her previous work?" (Id. at 62.) The VE responded negatively, adding, "She said she would probably need to take frequent bathroom breaks. Also, she takes naps from one to three hours during the day. She can have panic attacks which could last several hours up to a few minutes." (Id.)

### D.   The ALJ's Decision

An ALJ is required to follow a five-step sequential analysis to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520(a); id. § 416.920(a). The ALJ must continue the analysis until the claimant is found to be "not disabled" at steps one, two, four or five, or is found to be "disabled" at step three or step five. See 20 C.F.R. § 404.1520(a); id. § 416.920(a) In this case, the ALJ proceeded to step four and found Woodmancy to be not disabled. (See Tr. at 14-26.)

Step one requires the ALJ to determine whether the claimant is currently engaged in substantial gainful activity. See 20 C.F.R. § 404.1520(a)(4)(i), (b); id. § 416.920(a)(4)(i), (b). If the claimant is engaged in substantial gainful activity, the ALJ will find that the claimant is not disabled. See 20 C.F.R. § 404.1520(a)(4)(i), (b); id. § 416.920(a)(4)(i), (b). In the instant case, the ALJ found that Woodmancy "has not engaged in substantial gainful activity since October 31, 2009, the alleged onset date." (Tr. at 15 (citations omitted).)

Step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. § 404.1520(c); id. § 416.920(c). A "severe impairment" is an impairment or combination of impairments that significantly limits the claimant's ability to do "basic work activities" and satisfies the "duration requirement." See 20 C.F.R. § 404.1520(a)(4)(ii), (c); id. § 404.1509 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous

17

period of at least 12 months."); id. § 416.920(a)(4)(ii), (c); id. § 416.909.  Basic work activities include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers and usual work situations"; and "[d]ealing with changes in a routine work setting."  20 C.F.R. § 404.1521(b); id. § 416.921(b).  If the claimant cannot prove such an impairment, the ALJ will find that the claimant is not disabled.  See 20 C.F.R. § 404.1520(a)(4)(ii), (c); id. § 416.920(a)(4)(ii), (c).  The ALJ found that Woodmancy "has the following severe impairments: heart attack; hypertension; and deep vein thrombosis."  (Tr. at 16 (citations omitted).)

Step three requires the ALJ to compare the claimant's impairment or impairments to a list of impairments.  See 20 C.F.R. § 404.1520(a)(4)(iii), (d); id. § 416.920(a)(4)(iii); see also 20 C.F.R. Part 404, Subpart P, App'x 1.  If the claimant has an impairment "that meets or equals one of [the] listings," the analysis ends and the claimant is found to be "disabled."  See 20 C.F.R. § 404.1520(a)(4)(iii), (d); id. § 416.920(a)(4)(iii).  If a claimant does not suffer from a listed impairment or its equivalent, then the analysis proceeds to steps four and five.  See 20 C.F.R. § 404.1520(a); id. § 416.920(a).  The ALJ found that Woodmancy "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  (Tr. at 17 (citations omitted).)

Step four requires the ALJ to consider the claimant's residual functional

capacity (RFC)[4] to determine whether the impairment or impairments prevent the claimant from engaging in "past relevant work." See 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f); id. § 416.920(a)(4)(iv), (e), (f).  If the claimant is able to perform any past relevant work, the ALJ will find that the claimant is not disabled.  See 20 C.F.R. § 404.1520(a)(4)(iv), (f); id. § 416.920(a)(4)(iv), (f).  The ALJ concluded that Woodmancy "has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a), i.e., she can lift and carry 10 pounds occasionally and less than 10 pounds frequently, sit 6 hours in an 8-hour workday, and is not required to be on her feet for standing or walking more than 2 hours in an 8-hour workday.  She can occasionally climb, balance, stoop, kneel, crouch, and crawl, and she must avoid concentrated exposure to cold, heat, fumes, and hazards." (Tr. at 17.)  The ALJ also found that Woodmancy "is capable of performing all past relevant work including dispatcher, telephone solicitor, information clerk, and collection clerk," which "do not require the performance of work-related activities precluded by the claimant's residual functional capacity."  (Id. at 25 (citations omitted).)

### III.    STANDARD OF REVIEW

I must review the Commissioner's decision to determine "whether there is substantial evidence based on the entire record to support the ALJ's factual findings." Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997) (quoting Clark v. Chater, 75

---

[4] "'Residual functional capacity' is what the claimant is able to do despite limitations caused by all of the claimant's impairments." Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)).  See also 20 C.F.R. § 416.945(a).

F.3d 414, 416 (8th Cir. 1996)).  See also Collins v. Astrue, 648 F.3d 869, 871 (8th Cir. 2011).  "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008) (citations and internal quotation marks omitted). A decision supported by substantial evidence may not be reversed, "even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome." McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010).  Nevertheless, the court's review "is more than a search of the record for evidence supporting the Commissioner's findings, and requires a scrutinizing analysis, not merely a 'rubber stamp' of the Commissioner's action." Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008) (citations, brackets, and internal quotation marks omitted).  See also Moore v. Astrue, 623 F.3d 599, 602 (8th Cir. 2010) ("Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision.").

I must also determine whether the Commissioner's decision "is based on legal error." Collins v. Astrue, 648 F.3d 869, 871 (8th Cir. 2011) (quoting Lowe v. Apfel, 226 F.3d 969, 971 (8th Cir. 2000)).  "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." Id. (citations omitted).  No deference is owed to the Commissioner's legal conclusions. See Brueggemann v. Barnhart, 348 F.3d 689, 692 (8th Cir. 2003).  See also Collins, 648 F.3d at 871 (indicating that the question of whether the ALJ's decision is based on legal error is reviewed de novo).

## IV.   ANALYSIS

Woodmancy argues that the Commissioner's decision must be reversed because 1) the ALJ failed to give controlling weight to Dr. Ortman's opinion that Woodmancy's incontinence was secondary to nerve damage from a retroperitoneal hematoma, and 2) the ALJ did not properly evaluate the credibility of Woodmancy's allegations of incontinence.  (See Pl.'s Br. at 11, 17, ECF No. 14.)  She adds that the VE's testimony establishes that the ALJ's errors are not harmless.  (Id. at 20.)  I shall analyze each of her arguments in turn.

### A.   Whether Dr. Ortman's Opinion Was Entitled to Controlling Weight

Woodmancy argues first that the ALJ erred by failing to give controlling weight to Dr. Ortman's opinion that Woodmancy has "problems with intermittent bowel and bladder incontinence" that "is probably secondary to nerve injury at the time of a retroperitoneal hematoma during a severe illness in 2009."  (Pl.'s Br. at 11, ECF No. 14 (quoting Tr. at 907).)

The parties do not dispute that Dr. Ortman is Woodmancy's treating physician. "A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record."  Samons v. Astrue, 497 F.3d 813, 817-818 (8th Cir. 2007) (internal quotation marks omitted).  "Even if the opinion is not entitled to controlling weight, it should not ordinarily be disregarded and is entitled to substantial weight."  Id. at 818 (citations and internal quotation marks omitted).  "But the ALJ may give a treating doctor's opinion limited weight if it provides conclusory statements only or is inconsistent with the record."  Id. (citations omitted).  See also Renstrom v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) ("An ALJ may discount or

even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." (quoting <u>Perkins v. Astrue</u>, 648 F.3d 892, 897-98 (8th Cir. 2011))).  The ALJ must "give good reasons" for the weight given to a treating source's opinion. 20 C.F.R. § 404.1527(c)(2); 20 C.F.R. § 416.927(c)(2).

The ALJ's decision includes no discussion of the degree of weight that was given to Dr. Ortman's opinion, although scattered references to Dr. Ortman's letter do appear in various paragraphs.  (<u>See</u> Tr. at 16, 21, 23.)  On page 16 of the transcript, the ALJ wrote, "[Woodmancy's] treating source, Dr. Ortman, did report in a letter received subsequent to the hearing that Ms. Woodmancy has had bladder and bowel incontinence, but no records from Dr. Ortman are evident in the record to substantiate this report."[5]  Similarly, when discussing Woodmancy's RFC, the ALJ wrote,

> There were continual references in the office notes from the therapist, Sheryl Scott, that the claimant was having incontinence issues, but there was no medical evidence to show this beyond the one reference on May 20, 2010, when she was initially seen at Douglas County Health Center.  A letter from the claimant's treating source, James Ortman, MD, dated September 19, 2011, received subsequent to the hearing, confirmed that she had been experiencing intermittent bowel and bladder incontinence, probably secondary to nerve injury at the time of a retroperitoneal hematoma during a severe illness in 2009.
>
> . . . There is only one mention of complaints of incontinence and headaches in the record, i.e., when she was seen on May 20, 2010, but no further indication of

---

[5] I take it that this sentence is meant to provide an explanation for the ALJ's decision to exclude intermittent bowel and bladder incontinence from the list of severe impairments at step two of the sequential analysis.  (<u>See</u> Tr. at 16.)

> ongoing care for these problems, until Dr. Ortman reported after the hearing that she had been having bladder and bowel incontinence.

(Id. at 21.)  Later in the decision, the ALJ added,

> In terms of the claimant's alleged incontinence, the only mention was made when she was seen initially at Douglas County Health Care on May 20, 2010, again after the initial denial of her claim.  The only reference to this problem after that was made during the claimant's mental health therapy sessions and a letter from Dr. Ortman subsequent to the hearing indicating that she had been having these problems.  Even then, Dr. Ortman did not suggest any limitations associated with this condition.

(Id. at 23.)

Based on the foregoing references to the letter, and because the ALJ neither listed "intermittent incontinence" as a severe impairment at step two of the sequential analysis nor incorporated the limiting effects of intermittent incontinence into Woodmancy's RFC, I infer that the ALJ gave no weight to Dr. Ortman's opinion. After careful consideration, I find that the ALJ failed to cite good reasons for doing so.

As noted previously, Dr. Ortman's opinion is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. It is not clear whether Dr. Ortman's opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques.  I therefore find that the opinion is not entitled to controlling weight.

It does not follow, however, that it was appropriate for the ALJ to disregard Dr. Ortman's opinion completely.  On the contrary, the opinion is entitled to substantial weight unless 1) other medical assessments are supported by better or more thorough

23

medical evidence, 2) the opinion is conclusory, or 3) the opinion inconsistent with the record or the treating physician's other opinions. E.g., Renstrom, 680 F.3d at 1064; Samons, 497 F.3d at 818. There is no medical assessment in the record suggesting that Woodmancy does not suffer from intermittent bowel or bladder incontinence. Nor is Dr. Ortman's opinion conclusory; rather, it states specifically the nature of Woodmancy's impairment and suggests its likely cause. (See Tr. at 907.) Thus, grounds 1) and 2) do not provide a basis for disregarding Dr. Ortman's opinion.

The ALJ appears to have discounted Dr. Ortman's opinion on the ground that Woodmancy's incontinence was mentioned in only one medical record apart from the therapy notes. (See Tr. at 16, 21, 23.) The Commissioner rightly concedes, however, that this finding is incorrect. (See Defs.' Br. at 13-14, ECF No. 20. See also supra Part II.A (identifying references to incontinence in the medical records).) Moreover, I can find no evidence in the record that is inconsistent with Dr. Ortman's opinion.

The ALJ also noted that "Dr. Ortman did not suggest any limitations associated with" Woodmancy's incontinence. (Tr. at 23.) This is true in a literal sense, though it seems to me that the limitations associated with "intermittent bowel and bladder incontinence," (Tr. at 907), are not difficult to infer. In any event, I remain persuaded that the ALJ erred by rejecting Dr. Ortman's opinion that Woodmancy suffers from the condition, even if he did not articulate the limitations associated with it.

In summary, the ALJ appears to have disregarded completely Dr. Ortman's opinion that Woodmancy suffers from intermittent bowel and bladder incontinence without providing sufficient reasons for doing so. The Commissioner's decision must therefore be reversed so that proper consideration may be given to Dr. Ortman's opinion.

## B.   The ALJ's Analysis of Woodmancy's Credibility

Woodmancy also argues that the ALJ failed to evaluate properly the credibility of Woodmancy's allegations of incontinence.  (Pl.'s Br. at 17-20, ECF No. 14.)  I agree.

"The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts."  Moore v. Astrue, 572 F.3d 520, 524 (8th Cir. 2009) (quoting Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001)).  "In assessing a claimant's credibility, the ALJ must consider: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the participating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints."  Id. (citing, inter alia, Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)).  "An ALJ who rejects [subjective] complaints must make an express credibility determination explaining the reasons for discrediting the complaints."  Id. (citation omitted) (alteration in original).  The ALJ need not explicitly discuss each of the foregoing factors, however. Id. (quoting Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005)).  "It is sufficient if [the ALJ] acknowledges and considers [the] factors before discounting a claimant's subjective complaints."  Id. (quoting Goff, 421 F.3d at 791) (alteration in original). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so," courts "will normally defer to the ALJ's credibility determination."  Jones v. Astrue, 619 F.3d 963, 975 (8th Cir. 2010) (quoting Halverson v. Astrue, 600 F.3d 922, 932 (8th Cir. 2010)).

Woodmancy testified that she experienced bladder incontinence that caused unexpected releases of urine in varying amounts; that she experienced bowel

incontinence, which she had "the hardest time dealing with"; and that she wore "protection," but her protection was inadequate to deal with episodes of bowel incontinence. (Tr. at 50-51.)

In disregarding Woodmancy's testimony, the ALJ first cited the lack of objective medical evidence supporting her allegations. (Tr. at 21.) To be precise, the ALJ did not find that there was an "absence of objective medical evidence to support the claimant's complaints." Moore, 572 F.3d at 524 (emphasis added). Rather, the ALJ appears to have concluded that because there is no indication of "ongoing care" for incontinence, and because there is only one reference to incontinence in the "medical records" (setting aside the therapist's "notes," which contain multiple references to it), Woodmancy's allegations of incontinence may be discounted entirely. (See Tr. at 21.) In any case, it seems to me that the ALJ's finding on this point is tainted by: 1) the ALJ's improper decision to disregard the opinion of Woodmancy's treating physician, and 2) the ALJ's failure to recognize that incontinence is referenced in more than one medical record. Given these errors, I conclude that it was improper for the ALJ to discredit Woodmancy's allegations on the ground that her testimony is not supported by objective medical evidence.

The Commissioner argues that "[t]he ALJ correctly found that there was no evidence of treatment or medication for [Woodmancy's] alleged incontinence." (Def.'s Br. at 14, ECF No. 20.) The ALJ did state that Woodmancy "takes no medication to manage her alleged incontinence," (Tr. at 23), and this statement appears to be accurate. The record shows, however, that Woodmancy wears "protection" to deal with her incontinence problems, (e.g., Tr. at 50), and there is no indication that any other form of treatment is available to her. The Commissioner may choose to explore this point further on remand, but a fair reading of the current

transcript cannot support a finding that Woodmancy's failure to take medication undermines the credibility of her allegations of incontinence.

The Commissioner also argues that it was proper for the ALJ to disregard Woodmancy's testimony because Dr. Ortman "never described how her incontinence affected her functional ability or limited her in any way." (Def.'s Br. at 15, ECF No. 20.) It is true that Dr. Ortman's letter does not discuss the implications of a diagnosis of intermittent bowel and bladder incontinence. As I noted above, however, it seems to me that the "functional abilit[ies]" affected by such a diagnosis are readily apparent without elaboration. Furthermore, the record contains evidence from Woodmancy and other sources describing disruptions that have been caused by her episodes of incontinence. (See, e.g., Tr. at 50-51, 283, 897, 901.) In short, I am not persuaded that Dr. Ortman's failure to specify the ways in which intermittent incontinence can limit a person does not provide a sufficient basis for disregarding Woodmancy's allegations.

Finally, the Commissioner argues that the ALJ made a number of additional observations that do not relate directly to Woodmancy's allegations of incontinence, but nevertheless support the conclusion that Woodmancy is not a fully credible witness. (See Def.'s Br. at 15-18, ECF No. 20.) Specifically, the Commissioner states that Woodmancy's daily activities, her "focus on receiving benefits," and her "late addition" of incontinence, weakness, mental confusion, and headaches to her claim all undermine her credibility. (See id.)

The Commissioner's points are well-taken. It is proper for the ALJ to consider whether a claimant's daily activities are consistent with her allegations of disability. See, e.g., Renstrom v. Astrue, 680 F.3d 1057, 1067 (8th Cir. 2012) ("We have held

27

that acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility." (quoting Halverson v. Astrue, 600 F.3d 922, 932 (8th Cir. 2010))).   It is also proper for the ALJ to consider whether a claimant's credibility is undermined by her motivation to qualify for benefits, cf. Gaddis v. Chater, 76 F.3d 893, 895-96 (8th Cir. 1996) (indicating that the claimant could be discredited based on evidence of a "strong element of secondary gain"), and her failure to mention a particular impairment in the original application for benefits, cf. Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001) ("The fact that she did not allege depression in her application for disability benefits is significant, even if the evidence of depression was later developed.").   In the instant case, there is substantial evidence indicating that Woodmancy's motivation to qualify for benefits was so strong that it interfered with her progress in therapy.   (E.g., Tr. at 904-905.)   This undermines Woodmancy's credibility generally.   There is also evidence indicating that Woodmancy was capable of a wide range of daily activities, and it is true that Woodmancy's initial claims for benefits did not list incontinence as an impairment. These factors may also weigh against Woodmancy's credibility–though the fact that Woodmancy's initial applications for benefits were filed before she left the hospital to begin her inpatient rehabilitation seems to limit the significance of the latter point. Nevertheless, I am persuaded that given the entire record–which includes consistent, uncontradicted evidence that Woodmancy suffers from bowel and bladder incontinence–the ALJ failed to give good reasons for discrediting Woodmancy's allegations of incontinence.   This failure, coupled with the ALJ's failure to give proper weight to Dr. Ortman's opinion, undermines the Commissioner's decision to exclude the effects of intermittent incontinence from Woodmancy's RFC.   The case must therefore be remanded for further proceedings.

28

**IT IS ORDERED** that the Commissioner of Social Security's decision is reversed.

Dated May 6, 2013.

BY THE COURT

Warren K. Urbom
United States Senior District Judge